UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:

LARRY SCHAEFER                                      Chapter 7
and ELAINE SCHAEFER

    Debtors.                                 Bankruptcy No. 03-04001M

DAVID A. SERGEANT, trustee

    Plaintiff

v.                                                 Adversary No. 04-9053M

G.R.D. INVESTMENTS, L.L.C.,
LARRY SCHAEFER, ELAINE SCHAEFER

    Defendants.

Memorandum Decision and Order Re
Complaint and Trustee's Objection to Homestead

The Chapter 7 trustee objects to the debtors' claims of
exemption in their homestead.  Hearing on this matter was held on
May 18, 2005 in Fort Dodge.  The matter was joined with final trial
of the trustee's complaint against the debtors and G.R.D.
Investments, L.L.C. ("G.R.D.") seeking to avoid transfers alleged to
be preferential or fraudulent transfers.  Defendants G.R.D., Larry
Schaefer, and Elaine Schaefer were represented by attorney Dale L.
Putnam.  Attorney Eric W. Lam appeared for plaintiff David A.
Sergeant, Chapter 7 trustee.

The court has jurisdiction over these matters under 28 U.S.C.
§§ 1334(a), 1334(b), and 157(a) and the District Court's order of
reference.  This is a core proceeding under 28 U.S.C. §§
157(b)(2)(B), (F) and (H).

1

<u>Findings of Fact</u>

Larry Schaefer and Elaine Schaefer filed a voluntary Chapter 7 petition on October 20, 2003.  G.R.D. is an Iowa Code Chapter 490A domestic limited liability company.  Larry and Elaine Schaefer are the managers of G.R.D.  Their sons Ray Schaefer and Dean Schaefer are members of the company.

In 1996, Land O'Lakes sued Larry for breach of a grain contract.  On or about March 11, 1998, Land O'Lakes obtained a judgment against him in the amount of $127,125.00 plus interest.

Land O'Lakes commenced a fraudulent transfer action in the United States District for the Eastern District of Oklahoma against Larry and Elaine.  On October 25, 1999, Land O'Lakes obtained a judgment in the Oklahoma litigation against Elaine in the amount of $161,749.19.  This amount represented the judgment against Larry plus accrued interest and costs.  <u>See</u> Exhibit 140 at 6.

On October 29, 1999, only Elaine filed a Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Iowa.  On October 12, 2000, the court dismissed the case as filed in bad faith.  The court found the "case was filed primarily for the purpose of helping Larry Schaefer to evade or to delay payment of his judgment obligation to Land O'Lakes."  <u>In re Schaefer</u>, No. 99-02868M, slip op. at 16 (Bankr. N.D. Iowa Oct. 12, 2000).

On October 23, 2000, Elaine filed a motion to stay the October 12 order dismissing her Chapter 11 case.  On October 27, 2000, the court denied the motion for stay.  Elaine appealed the dismissal order to the United States District Court for the Northern District

of Iowa.  On or about March 6, 2001, the United States District

Court dismissed Elaine's appeal.

G.R.D. was formed on January 11, 2001, with the assistance and

advice of attorney Putnam.  The company's Articles of Organization

were filed with the Iowa Secretary of State on January 12, 2001.

The Articles name Larry and Elaine Schaefer as the managers of

G.R.D.  Since the formation of G.R.D., no one other than Larry and

Elaine has been a manager of the company

Also on January 11, 2001, a "Managers Employment Agreement" was

executed, providing as follows:

> Comes now, Ray Schaefer and Dean Schaefer, and Larry and
> Elaine Schaefer and hereby enter into the following
> Managers Employment Agreement:
>
> 1.   In consideration of Larry and Elaine Schaefer
> conveying their real estate, except for their homestead,
> into the entity known as G.R.D. Investments, L.L.C.,
> subject to the debt against said property, we do hereby
> agree to employ Larry and Elaine Schaefer as managers of
> G.R.D. Investments, L.L.C.  . . .
>
> 2.   Larry and Elaine Schaefer agree to perform their duties as
> set forth in the Operating Agreement for G.R.D. Investments,
> L.L.C., Article V.

Exhibit 128.  For their employment Larry and Elaine are each to

receive a salary of $20,000 per year, payable "bi-monthly," with

increases of $1,000 each year of the contract.  The term of the

employment agreement is fifteen years.  The agreement provides

further that "G.R.D. Investments, L.L.C., shall provide health

insurance" for Larry and Elaine.  Id., ¶ 1(A)-(F).  The document was

signed by Ray and Dean Schaefer without any indication that they

were acting on behalf of G.R.D.

3

On January 16 and 17, 2001, Larry and Elaine Schaefer

transferred all their real property holdings, except 40 acres

claimed as their homestead, to G.R.D. by quit claim deed.  The

property transferred is described as follows:

| Exhibit No. | Address | Short Legal Description |
|---|---|---|
| 76 | 1106 South Shore Dr. | Lot One in E.L.Callahan's Addition to Clear Lake, Iowa |
| 77 | 504 Hwy. 18 East | L'S 17-18-19 EXC COM AT SE COR L 19 TH S 89°51½' W 164.4' ALONG S LINE E L 19 |
| 78 | 1108 South Shore Dr. | Lot Two of E.L.Callahan's Addition to Clear Lake, Iowa |
| 79 | 1409 7th Ave. North | TRACT 1 DESC AS A TRACT OF LAND SE¼ SW¼ COMM AT S ¼ COR SEC 7TH W 165 |
| 80 | 520 Hwy. 18 East | L 12 RICHARD BURDENS ADD EXC N 195.8' OF E1/2 & EXC N 200' OF W1/2 & EXC HWY |
| 81 | 15274 Pascal Street | L 3 BL 1 P M PARK |
| 82 | 109 N. 3rd Street | S 24' OF N 59' L'S 10,11,12 & W 8' OF N 35' L 10 BL 10 ROCKWELL |
| 83 | Farm | SW NW 28-95-20<br>NE NE 29-95-20<br>SE NW 28-95-20<br>NE NW 28-95-20 |
| 84 | 27 Plaza Drive | BEG AT NE COR L 4 BL 3 FIELDSTONE 1st ADD TH S 89° 50'19" W 214' TO NW COR L 4TH S |
| 85 | 25 Plaza Drive[1] | L 4 BL 3 FIELDSTONE 1st ADD EXC BEG AT NE COR L 4 BL 2 TH S 89° 50 '19" W 214' TO NW COR |

---

[1] Exhibit S contains ten forms declaring the value of property transferred to G.R.D. on January 16 and 17, 2001.  Two of the parcels are identified as 25 Plaza Drive and 27 Plaza Drive, Clear Lake, Iowa.  The property identified in Exhibit 84 is commonly known as 27 Plaza Drive.  The property identified in Exhibit 85 has been referred to as an "unnamed parcel."  Because the parcels in Exhibits 84 and 85 together make up Lot Four in Block Three in Fieldstone First Addition to Clear Lake, Iowa, the court will refer to the parcel in Exhibit 85 as 25 Plaza Drive.

After the transfer of the real estate via the quit claim deeds, Larry and Elaine retained only 40 acres they claimed as their homestead, and no other real estate interests.  The homestead property is described as the Northwest Quarter of the Northwest Quarter of Section 28 in Township 95 North of Range 20 West of the 5th P.M., Cerro Gordo County, Iowa.

The quit claim deeds for the parcels identified in Exhibits 76 to 85 were recorded on or about January 25, 2001.  See Exhibit S.

The farm ground transferred to G.R.D. was approximately 160 acres of land in Cerro Gordo County.  At the time of the transfer, the land was being farmed by Dean Schaefer.  After that, it was farmed by Ray Schaefer.  Exhibit 69, deposition pages 27-29.

During January 2001, the debtors also transferred 120 acres of real estate in Oklahoma to G.R.D.  There was no evidence offered to identify this property further or to show its value.  In 2004, the Oklahoma land was being leased to Glenn Schaefer, another of Larry and Elaine's sons.  Exhibit 69, deposition pages 79-80.

Before the January 2001 quit claim deeds were executed and tendered to G.R.D., Larry and Elaine managed the Iowa real property described in the deeds.  After the quit claim deeds were executed and tendered to G.R.D., Larry and Elaine continued to manage the same real estate.  Larry's and Elaine's duties under the manager's Employment Agreement include collecting rent, showing the rental properties, and maintaining the properties.  Ray Schaefer said the agreement obligates him to pay his parents for the term of the

agreement, regardless of whether they are able to do the work.   They could perform the agreement, he said, by hiring others to do the work.

On January 11, 2001, the same date G.R.D. was formed and the Managers Employment Agreement was executed, Ray and Dean Schaefer certified their adoption of an operating agreement for G.R.D. (the "Operating Agreement").   Exhibit 26.   Ray and Dean Schaefer were named members of the company.   Since the date of formation of the company, there have been no other members of G.R.D.

The Operating Agreement requires each member to make an initial capital contribution to the company.   Id. at ¶ 8.1.   Schedule A to the Operating Agreement indicates that Dean Schaefer and Ray Schaefer, as members of G.R.D., each made a 50% share of initial capital contribution.   Larry and Elaine Schaefer are identified on Schedule A as managers.   The document then states: "Capital Contribution is comprised of the following real estate and any structures constructed thereon: See attached Quit Claim Deeds."   The deeds referred to are the same as those identified in Exhibits 76 to 85 by which Larry and Elaine Schaefer transferred their property to G.R.D. on January 16 and 17, 2001.

In depositions, Ray and Dean each stated that he had made a cash contribution to the company in the amount of $25,000 to $30,000.   Exhibit 102, deposition page 8; Exhibit 103, deposition pages 8-9.   There was no evidence at trial that either Ray or Dean made a cash contribution to G.R.D.   There was no explanation of the

7

inconsistency between the deposition testimony and Schedule A to the Operating Agreement. The court finds that neither Ray nor Dean made a cash capital contribution to the company at the time it was formed. Their later contributions to the business of G.R.D., including guarantees of company debt, will be discussed below.

Pursuant to the Operating Agreement, the purpose of the company is the purchase, sale and rental of real estate. Exhibit 26, Art. III. The agreement provides that the business and affairs of G.R.D. are to be managed by its managers. "Each manager shall participate in the direction, management and control of the business of the Company to the best of his or her ability." _Id._, Art. V at ¶ 5.1. By executing the Operating Agreement, Ray and Dean Schaefer made "written consent to the election" of Larry and Elaine Schaefer as managers of G.R.D. _Id._ at ¶ 5.2 & Schedule A.

The Operating Agreement gives the managers broad powers to act on behalf of the company, including the authority to acquire property; borrow money; purchase property insurance; hold and own property in the name of the company; make investments; sell assets; execute documents including deeds of trust, security agreements, financing statements, and documents for the acquisition, mortgage or disposition of the company's property; employ accountants, legal counsel, managing agents or other experts and to compensate them from company funds; enter into contracts; declare and pay distributions to the members; make charitable donations; purchase insurance on the life of members, managers, or employees;

8

participate in other associations; and perform "all other acts as may be necessary or appropriate to the conduct of the Company's business." Id. at ¶ 5.3.

The managers of G.R.D. also have the power to fix their own salaries, subject to member approval, and appoint themselves as officers of the company. Id. at ¶¶ 5.10, 5.11. The managers are to maintain the company's books. Id. at ¶ 6.3. Managers are responsible for the filing of the company's tax returns, and they are authorized to make all elections permitted to be made by the company under state and federal law. Id. at ¶¶ 9.7, 9.8.

The Operating Agreement of G.R.D. assigns a distinctly different role to members.

> Unless authorized to do so by this Operating Agreement or by a Manager or Managers of the Company, no Member, agent or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

Id. at ¶ 5.3, last subparagraph.

Members have the right to inspect the company's books. Id. at ¶ 6.3. Member approval is required to dissolve the company or to sell all or substantially all of the assets of the company. Id. at ¶ 6.6(a), (c). Members are not liable for debts or losses of the company beyond their capital contribution. Id. at ¶ 6.1.

At the time of the transfers, Larry and Elaine did not calculate either the value of the real property they transferred to G.R.D. or the value of the employment agreement they made with their

9

sons.  During the course of the litigation of this adversary

proceeding, plaintiff requested Larry and Elaine Schaefer to provide

the market value as of January 16, 2001 of each parcel of Iowa real

property transferred to G.R.D., the amount of debt that was a lien

against each such parcel as of that date, and the consideration for

the transfer of each parcel.  In March 2004, Larry and Elaine

Schaefer provided the following figures:

| Exhibit No. | Address | Value | Lien |
|---|---|---|---|
| 76 | 1106 S. Shore Dr. | $ 41,850 | $ 37,955 |
| 77 | 504 Hwy 18 E. | 75,859 | 104,854 |
| 78 | 1108 S. Shore Dr. | 63,150 | 54,320 |
| 79 | 1409 7th Ave N. | 156,981 | 162,500 |
| 80 | 520 Hwy 18 E. | 152,183 | 0.00 |
| 81 | 15274 Pascal St. | 43,890 | 31,250 |
| 82 | 109 N. 3rd, Rockwell | 4,794 | 0.00 |
| 83 | 160 acre farm | 109,856 | 182,900 |
| 84 | 27 Plaza Drive | 121,683 | 78,797 |
| 85 | 25 Plaza Drive | n/a | n/a |
| Totals | | $770,246 | $652,576 |

See Exhibit 104.  The debt encumbering the 160 acres of farmland was

also secured by a lien on the 40-acre homestead.  The lien values

provided by Schaefers were mortgage and contract balances.  In

January 2001, at least some of the property was encumbered by

delinquent real estate taxes of about $35,000.  One parcel was

subject to a mechanic's lien for about $25,000.

Larry and Elaine stated that the "consideration for all of the

property was the debt assumption, payment of the outstanding real

estate taxes, and the employment contract.  Further consideration

was that GRD was taking the property subject to the judgment on

10

behalf of Land O' Lakes against *Larry & Elaine Schaefer*." Exhibit 104.

Although plaintiff had sought to discover the market value of the transferred property, Larry and Elaine Schaefer provided the values they had given to the county recorder for calculation of the transfer tax. The values provided by the Schaefers represent assessment values for years prior to 2001. Three of the figures are assessments from 1994. See Exhibit S.

When the January 2001 quit claim deeds were recorded, Schaefers declared a value for each parcel for the Cerro Gordo County Recorder. Part III of the declaration of value form was to be completed by the county assessor. The form for the assessor's data states: "Note: Assessed value shown must be as of January 1 of the year in which the sale occurred." Exhibit S.

Appraisals were made of several of the properties that Larry and Elaine transferred to G.R.D. in January 2001. An appraisal dated January 26, 2005 stated the market value of the 160-acre farm as of January 16, 2001[2] was $351,000. Exhibit 105. Reports dated January 31, 2005 made the following appraisals of market value as of January 16, 2001: 520 Hwy. 18 East, $160,000; 504 Hwy. 18 East, $165,000; 27 Plaza Drive, $108,000; 1409 7th Ave. North, $257,500. Exhibit 106. The property at 1409 7th Ave. North is an eight-unit

---

[2] The appraised value of the entire 200 acres as of January 16, 2001 was $459,000. The 40-acre homestead was valued at $108,000 as of that date. The date of "June 16, 2001" for valuation of the 160 acres is a typographical error.

apartment building.  Id., Part IV at 10.

On March 15, 2003, Larry prepared a financial statement of G.R.D. and executed the document as manager.  Exhibit 139.  By that date, G.R.D. had sold the property at 27 Plaza Drive.  See Exhibit 106, Part III at 33.

The 2001 assessed values from Exhibit S, appraised values from Exhibits 105 and 106, and financial statement values from Exhibit 139 are as follows:

| Ex. No. | Address | 2001 Assessment | Appraisal | 3/15/03 Fin'l Stmt |
|---------|---------|-----------------|-----------|--------------------|
| 76 | 1106 S. Shore Dr. | 62,050 | n/a | 75,000 |
| 77 | 504 Hwy 18 E. | 186,600 | 165,000 | 250,000 |
| 78 | 1108 S. Shore Dr. | 75,910 | n/a | 100,000 |
| 79 | 1409 7th Ave N. | 247,530 | 257,500 | 350,000 |
| 80 | 520 Hwy 18 E. | 159,840 | 160,000 | 220,000 |
| 81 | 15274 Pascal St. | 47,460 | n/a | 50,000 |
| 82 | 109 3rd. St. Rockwell | 5,330 | n/a | 10,000 |
| 83 | 160 acre farm | 121,940 | 351,000 | 448,000 |
| 84 | 27 Plaza Drive | 134,890 | 108,000 | n/a |
| 85 | 25 Plaza Drive | 9,900 | n/a | n/a |

The court finds that the 2001 assessed values, other than for the farmland, and the appraisal values are reasonable estimates of the value of the property as of January 2001.  The assessor's value of the farmland, equivalent to about $762 per acre, is not an indicator of fair market value.  The average value of Cerro Gordo County farmland in 2001 was more than $2,000 per acre.  Map 1: 2001 and 2000 Iowa Land Values, at http://www.extension.iastate.edu/emms/lvs2001/.  The appraisal value is the equivalent of $2,194 per acre.  Therefore, the court will disregard the assessed value and rely on the appraised value for the

value of the farmland.  The total value of the Iowa property transferred to G.R.D. in January 2001 was between $1,232,020 and $1,290,640.

Total contract and mortgage debt against the property was approximately $652,576.  A mechanic's lien for about $25,000 and delinquent real estate taxes of about $35,000 also existed as encumbrances on the property.  The court finds there was total equity in the property of roughly $500,000 to $575,000.

In June 2004, certified public accountant James R. Potter calculated the net present value of the employment agreement as of January 11, 2001, the date of the contract.  Using a 5.54% discount rate, Potter determined that the total value of the contract was $867,163.  Exhibit R.  This figure represents wages valued at $518,288, health insurance benefits of $312,466, and "self-employment tax savings" of $36,409.  Id.  Potter assumed an "18.7% annual increase in health insurance premiums for the years 2005 through 2015 . . . based on the average actual increases for the years from 2001 to 2004."  Id.

The defendants' position is that "assumption" of the debt against the property quit claimed to G.R.D. was part of the consideration for the property.  The property was transferred by quit claim deed, subject to all existing liens.  G.R.D. took over the payment of the mortgage and contract debts and paid the delinquent real property taxes.  The company did not agree to become liable for the Land O'Lakes judgment debt.

13

In January 2001, there was no written agreement requiring G.R.D. to refinance the debt against the property it had acquired from Larry and Elaine.  In 2003 G.R.D. borrowed money from Hancock County Bank & Trust, now known as Liberty Bank, to refinance the debt, thus eliminating Larry and Elaine's personal liability on the mortgages and contracts.  Exhibits F, G.

In January 2001, Ray and Dean had not agreed to become personally liable for the debt encumbering the property quit claimed to G.R.D.  On January 17, 2003, Ray and Dean guaranteed all existing and future obligations of G.R.D. owed to Liberty Bank.  Exhibit H.

Larry Schaefer prepared financial statements as manager of G.R.D. in March 2003 and May 2004.  Exhibits 139, H.  On August 2, 2001, G.R.D. sold the 27 Plaza Drive property to Leslie Nelson. Larry and Elaine Schaefer executed the warranty deed as managers of G.R.D.  In May 2002, Larry and Elaine requested from Clear Lake Bank & Trust an extension of the loan on the property at 1106 South Drive.  Exhibit 150.  On September 16, 2003, attorney Dale Putnam wrote to Cerro Gordo County officials regarding the property at 15274 Pascal Street, referring to it as the property of Larry Schaefer.  Exhibit 131.  The evidence shows that after the January 2001 transfers, Larry and Elaine Schaefer were conducting the business and affairs of G.R.D. consistently with their authority under Article V of the operating agreement.

On several occasions, Ray and Dean Schaefer executed notes and mortgage documents as "managers" of G.R.D.  The documents were

14

prepared by the bank.   The designation was in error.  Ray and Dean are not managers of G.R.D.

On July 3, 2003, attorney Dale Putnam gave a title opinion to Hancock County Bank & Trust in Garner, Iowa, regarding the 160-acre farm that was transferred to G.R.D.  Exhibit 132.  Putnam found "good and merchantable title" in G.R.D., "subject to a contract of record to Elaine Schaefer. . . ."  It was not explained how Elaine acquired a contract interest in the farmland years after Larry and Elaine supposedly quit farming.

On or about July 23, 2001, Land O'Lakes filed a complaint in the United States District Court for the Northern District of Iowa to enforce its claims against the 160 acres of farmland in Cerro Gordo County, notwithstanding the transfer to G.R.D.  Exhibit 140. There were settlement discussions in 2002.  An initial proposal was that Larry and Elaine would pay about $100,000 through installment payments.  G.R.D. did not agree to lend the money to fund the settlement payments that would have been due under this proposal.

In May 2003, Larry, Elaine, Ray and Dean Schaefer and G.R.D. settled all claims between them and Land O'Lakes.  Exhibit 141. Larry and Elaine executed the settlement document as individuals and on behalf of G.R.D. as its managers.  The settlement provided that Larry and Elaine Schaefer would pay Land O'Lakes $85,000.  This sum was tendered on or about May 12, 2003.  Exhibit 136.

G.R.D. borrowed $275,000 on May 1, 2003.  The note accrues interest at a variable rate.  Exhibit F, Loan No. 41600082.  G.R.D.

15

loaned $85,000 of that money to Larry and Elaine to fund the settlement with Land O'Lakes and used the rest to refinance debt. On April 2, 2003, Larry and Elaine executed a promissory note for $85,000.  The note provided that interest would accrue from May 1, 2004 at 6%.  Payments are to be made annually based on a 30-year amortization.  Exhibit 130.  The note was secured by a mortgage, also dated and recorded April 2, 2003, in their 40-acre homestead. Exhibit 135.  As of the date of trial, Larry and Elaine had made no payments on the note.  G.R.D. has not taken action to foreclose the mortgage.

Question 10 of the bankruptcy statement of financial affairs form asks debtors to list "all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of [the] case."  The question is not limited to transfers to insiders.  Larry and Elaine did not disclose the mortgage to G.R.D. in response to Question 10 in their statement of financial affairs.  Their Schedule D disclosed that Schaefers owed secured debt of $85,000 to G.R.D. and that the debt was incurred in April 2003.

On January 31, 2001, after the transfer of property to G.R.D., Larry and Elaine Schaefer were both judgment debtors of Land O'Lakes in the amount of at least $161,749.19.  The Schaefers continued to be liable for $652,576 of mortgage and contract debt secured by real property, as shown in Exhibit 104.  In addition, the following debts

16

listed in their amended Schedule F were jointly owed by Schaefers as

of January 31, 2001:

|  |  |
|---|---:|
| First National Bank of Omaha | $  3,267 |
| Wells Fargo Bank | 9,588 |
| James S. Matthews, Jr. | 24,705 |
| North Central FS, Inc. | 86,705 |
| Visa | 10,000 |
| Mercy Medical Center-North | 2,286 |
| Jim Drege & Associates | 5,000 |
| Newman Law Office | 12,000 |
| Heartland Asphalt, Inc. | 5,600 |
| Total | $159,151 |

On January 31, 2001, Larry and Elaine Schaefer owed total debt of

approximately $973,476.

Schaefers state they owned the following property as of that

date:

|  |  |
|---|---:|
| Homestead (exempt) |  |
| Equipment | $   90,000 |
| Employment agreement with G.R.D. | 867,163 |
| Life insurance (exempt) |  |
| Furniture | 3,000 |
| Cash in bank | 5,000 |
| Rent of 30 acres | 4,500 |
| Life insurance stock | 30,000 |
| Land O'Lakes stock | 5,600 |
| Nursing home stock | 1,000 |
| Golf course stock | 400 |
|  |  |
| Total | $1,006,663 |

This stipulated total figure includes furniture valued by Larry at

$3,000.  The court will assume the furniture would not have been

exempt.  The value Schaefers assign to the employment agreement with

G.R.D. is the value calculated by CPA Potter.  There was no evidence

to describe or value individual pieces of the farm equipment.  The

court assumes none of the property was encumbered by a lien.

17

On April 1, 2003, just prior to the date on which Schaefers gave G.R.D. a mortgage on their homestead, they owned their exempt homestead, exempt vehicles, nursing home stock valued at $1,000, golf course stock valued at $400, and the employment contract to manage G.R.D.'s property.

On April 1, 2003, they owed the Land O'Lakes judgments and the same $159,151 of joint general unsecured debt that they owed in January 2001.

Larry and Elaine Schaefer testified that their last year of farming was 1997.  They rented their farmland to their sons in subsequent years.  Their 1997 federal income tax return shows a loss of $28,047 from farming that year.  Exhibit 142.  They reported a loss of $102,534 from farming for tax year 1998.  Exhibit 143.  On their 2002 return, Larry and Elaine Schaefer reported a loss of $101,129 from farming.  Exhibit 144.  Their 2002 farm expenses included an item of $85,000 for "Grain Settlement Costs."  Id., Schedule F.  This item was the sum paid in May 2003 to settle claims with Land O'Lakes.  Larry Schaefer said it was a mistake to deduct it as an expense for the 2002 tax year.  As of the date of trial, an amended return had not been filed.  On their 2003 income tax return, Schaefers reported a loss of $19,326 from farming.  Exhibit P.

G.R.D.'s 2001 federal Return of Partnership Income balance sheet showed $3,005 due to employees as a current liability, but no "other liabilities."  Exhibit I, Schedule L, lines 17, 20.  The 2002 return showed $4,927 currently owed to employees, but no longer-term

18

liabilities owed them.  Exhibit J, Schedule L, lines 17, 20.  The
balance sheet in G.R.D.'s 2003 income tax return showed no
liabilities of any type owed to employees.  A debt of $77,400 "due
from employees" was listed as an asset.  Exhibit K, Schedule L,
lines 13, 17, 20. Financial statements prepared in 2003 and 2004 did
not list G.R.D.'s obligation under the January 2001 employment
agreement as a liability.  Exhibits H and 139.

When Larry and Elaine Schaefer filed their bankruptcy schedules
in October 2003, the only debt listed as owing to G.R.D. was the
$85,000 home mortgage debt.  Exhibit 200.  Schaefers did not list
their employment contract as an asset on their bankruptcy schedules.


### DISCUSSION

Plaintiff objects to the debtors' claims of exemption in their
homestead.  He also seeks to avoid transfers under various theories.
The complaint also alleged that debtors were not entitled to
discharges under §727.  Plaintiff bears the burden of proof on all
issues.  See Kaler v. Craig (In re Craig), 144 F.3d 587, 590 (8th
Cir. 1998) (fraudulent transfer under § 548); Benson v. Richardson,
537 N.W.2d 748, 756 (Iowa 1995)(§ 544, incorporating Iowa law of
fraudulent transfer); 11 U.S.C. § 547(g)(preference); Fed.R.Bankr.P.
4003(c) (exemptions).


### Objections to Discharge

The complaint in Adv. No. 04-9053 was filed March 30, 2004.

19

Plaintiff alleged in paragraphs 39 and 40 of the complaint that debtors had transferred property within a year prior to the date of the filing of their petition with the intent to hinder, delay or defraud creditors.  The complaint prayed that debtors be denied their discharges.

On April 7, 2004, plaintiff amended his complaint to add a ground for denial of discharge relating to farm rent.  Docket no. 4. On July 29, 2004, plaintiff again amended the complaint to add a ground for denial of discharge relating to a tax refund.  Docket no. 21.

On May 13, 2005, the parties filed a stipulated dismissal of portions of the complaint, including the objections to the debtors' discharges, which were designated Counts V, VII, and VIII.  Docket no. 57.  On May 19, 2005, the stipulated dismissal of the objection to discharge was noticed to all creditors and parties in interest as required by Fed.R.Bankr.P. 7041.  No objections were filed. Plaintiff's claims objecting to the debtors' discharges should be dismissed.

<u>Objection to Homestead Exemption</u>

In their schedule of real property, debtors listed an interest in 40 acres valued at $100,000 and subject to a secured claim of $85,000.  They claimed a homestead exemption of $15,000 pursuant to Iowa Code Chapter 561.  On March 30, 2004, the trustee timely objected to debtors' claims of exemption in their homestead on several grounds.  Docket no. 52.

On May 13, 2005, the trustee withdrew his allegations that debtors did not actually reside in and occupy the claimed homestead as their home and that G.R.D. is an alter ego of the debtors. Docket no. 122.  The trustee stated his intention to pursue his objection to the homestead to the extent of pre-acquisition debt. See Iowa Code § 561.21(1).  The trustee said he would also proceed at trial on his allegations that the home mortgage was either a preference or a fraudulent transfer.

Debtors claim they established their present homestead in 1988. Docket no. 55.  At trial, the trustee did not attempt to show that debtors acquired their homestead at a later date or that debtors incurred any debt prior to 1988.  Debtors' amended Schedule F does not show any debts incurred prior to 1988.  Exhibit 200A.  The court concludes that the trustee has not shown there is any debt pre-existing Schaefers' acquisition of their homestead.

Moreover, the trustee's avoidance powers cannot defeat the Schaefers' homestead exemption.  Assuming the trustee avoided the April 2003 mortgage either as a preference or as a fraudulent transfer, the mortgage would be preserved for the benefit of the estate.  11 U.S.C. § 551.  Because the mortgage was a voluntary transfer, Schaefers would not be able to exempt any such property recovered by the trustee.  11 U.S.C. § 522(g).  Avoidance of the mortgage, however, would not defeat the debtors' claim of exemption in the equity in their home.  Debtors would retain the homestead subject to a mortgage held by the trustee.  Schaefers' homestead

exemption claim appears to be limited to their equity in the property.  Therefore, plaintiff has not shown that the exemption was not properly claimed.


## Preferential Transfer

Plaintiff alleges in Count IX of the complaint, as amended May 9, 2005 (docket no. 53), that the April 2003 mortgage to G.R.D. to secure the loan of $85,000 was a preferential transfer that the trustee may avoid under § 547 of the Bankruptcy Code.  This section provides that--

> the trustee may avoid any transfer of an interest of the debtor in property--
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
>   (A) on or within 90 days before the date of the filing of the petition; or
>   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
>   (A) the case were a case under chapter 7 of this title;
>   (B) the transfer had not been made; and
>   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  The parties have stipulated that if plaintiff establishes that G.R.D. is an "insider," he has proven the preferential effect element of § 547(b)(5).  Docket no. 58.

Plaintiff argues the mortgage is avoidable under a theory of recovery enunciated in Levit v. Ingersoll Rand Financial Corp. (In

22

re V.N. Deprizio Construction Co.), 874 F.2d 1186 (7th Cir. 1989),
commonly known as the "Deprizio" case.   The Deprizio case involved
"outside creditors," which were financial institutions that had
loaned money to the debtor, and "inside creditors," who were
officers of the debtor who had guaranteed the loans.   In Deprizio,
Judge Easterbrook readily concluded that a payment to an outside
creditor is a transfer "for the benefit of" a guarantor that may
constitute a preference.   Id. at 1194; see also id. at 1190 (stating
the trustee's argument).   The holding of Deprizio was that a
transfer for the benefit of an inside creditor is recoverable from
the outside creditor, even when the payment was made between 90 days
and one year before the date of the filing of the petition.
Congress statutorily overruled the Deprizio line of cases in 1994 by
adding subsection 550(c) to the Code.   See generally 5 Collier on
Bankruptcy ¶ 550.04 (15th ed. rev. 2005).

     Because plaintiff in this case is not attempting to recover the
payment of $85,000 to Land O'Lakes, the Deprizio analysis is
unnecessary.   The mortgage to G.R.D. should be reviewed under a
straightforward application of § 547.

     Plaintiff argues that the mortgage was given on account of
antecedent debt because G.R.D. had agreed sometime in 2002 to fund a
settlement with Land O'Lakes.   Larry and Elaine claimed a farm
expense deduction for the $85,000 on their 2002 federal income tax
return.   The evidence did not disclose when the tax returns were
filed.   Exhibits 144 and O are unsigned and undated.   The returns

23

could have been filed after the money was paid to Land O'Lakes in May 2003.

During settlement discussions in 2002, the parties proposed that Larry and Elaine would make installment payments to Land O'Lakes. Larry Schaefer and Ray Schaefer both denied that G.R.D. had agreed to fund the payments. The evidence shows that Land O'Lakes agreed in 2003 to accept a lower amount paid in a lump sum.

Plaintiff has not shown that the mortgage was given on account of antecedent debt. Larry and Elaine gave G.R.D. a mortgage on their homestead on or about April 2, 2003. G.R.D. borrowed money on May 1, 2003. Exhibit F, loan no. 41600082. G.R.D. loaned $85,000 of that money to Larry and Elaine to fund the settlement with Land O'Lakes. A check in that amount was made on attorney Putnam's trust fund account on May 12, 2003. Exhibit 136. The court concludes that plaintiff's claim to avoid the mortgage to G.R.D. as a preferential transfer should be dismissed.

## Avoidance of April 2003 Mortgage as Fraudulent Transfer

Plaintiff contends the April 2003 mortgage to G.R.D. is avoidable pursuant to § 548 of the Bankruptcy Code, which provides:

> The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

> (A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ...

24

indebted; or

    (B)(i) received less than a reasonably equivalent value
in exchange for such transfer ... and

    (ii)(I) was insolvent on the date that such transfer
was made ... or became insolvent as a result of such
transfer....

11 U.S.C. § 548(a)(1).

    Under Iowa common law, the transfer of an interest in an exempt
homestead could not be avoided as a fraudulent transfer.  See <u>Benson
v. Richardson</u>, 537 N.W.2d 748, 757 (Iowa 1995) ("debtors have a
legal right to convey exempt property regardless of their motive");
Note, <u>Rights of Creditors in Property Conveyed in Consideration of
Future Support</u>, 45 Iowa L.Rev. 546, 553 & n.31 (1960) (conveyance
must be of nonexempt property to be fraudulent as to creditors).  If
property is already beyond the reach of creditors, it is difficult
to imagine a transfer of the property that operates to the prejudice
of the rights of creditors.  See <u>Benson v. Richardson</u>, 537 N.W.2d at
756 (defining "fraudulent conveyance").

    Nevertheless, Bankruptcy Code § 548 applies to "any transfer of
an interest of the debtor in property" without distinction between
exempt and nonexempt property.  The court will examine plaintiff's
arguments that the grant of the home mortgage in April 2003 was a
fraudulent transfer under § 548.

    Plaintiff argues unpersuasively that the mortgage to G.R.D. was
constructively fraudulent because Larry and Elaine received less
than reasonably equivalent value in exchange for the mortgage.  <u>See</u>

11 U.S.C. § 548(a)(1)(B).  His argument quibbles with the settlement with Land O'Lakes.  The question, however, is whether there was equivalent value between the loan of $85,000 and the mortgage given to G.R.D. in return.  The court finds there was.

Plaintiff argues also that the mortgage was a transfer made with actual intent to hinder, delay or defraud creditors.  <u>See</u> 11 U.S.C. § 548(a)(1)(A).  He cites <u>Brown v. Third National Bank (In re Sherman)</u>, 67 F.3d 1348 (8th Cir. 1995), for its discussion of the proof of actual intent to defraud.  Fraud is most often shown by circumstantial evidence that gives rise to an inference of fraudulent intent.  <u>Id.</u> at 1353.  Plaintiff argues the transaction contained several indicia of fraudulent intent, or "badges of fraud."  <u>See</u> docket no. 60, brief at 15-16.

In April 2003, when Larry and Elaine made the mortgage transaction, they were under financial pressure.  Land O'Lakes had two judgments against them and had filed a third lawsuit.  Schaefers decided to settle all the claims between themselves and Land O'Lakes, which agreed to accept $85,000 in settlement.  Schaefers' sons Ray and Dean, who were also defendants in the lawsuit, were willing to lend the money to them through a loan made by G.R.D.  Larry and Elaine would have had difficulty obtaining financing elsewhere.  Ray and Dean loaned their parents money under more favorable terms than a commercial lender would have made.  They have been advised not to take action to enforce the mortgage while the bankruptcy case is pending.  The mortgage was recorded, and the

26

secured debt to G.R.D. was listed in debtors' bankruptcy Schedule D.

The court concludes that the transfer of the mortgage, given to

secure debt incurred to pay off a major creditor, was not a transfer

made with intent to hinder, delay or defraud creditors.


### Avoidance of January 2001 Transfers as Fraudulent Transfers

The transfers of the quit claim deeds in January 2001 are

outside the one-year reach-back period of § 548(a)(1).  Plaintiff

seeks to avoid the 2001 transfers through the trustee's avoidance

powers in § 544(b)(1).  That section provides that--

> the trustee may avoid any transfer of an interest of the
> debtor in property or any obligation incurred by the
> debtor that is avoidable under applicable law by a
> creditor holding an unsecured claim that is allowable
> under section 502 of this title.

11 U.S.C. § 544(b)(1).  The "applicable law" in this case is Iowa's

enactment of the Uniform Fraudulent Transfer Act.

The Iowa UFTA, codified in Iowa Code Chapter 684, determines

the extent of plaintiff's rights.  Thus, plaintiff may bring an

avoidance action within five years of the date of the transfers.

Iowa Code § 684.9; see also 684.7 (remedies of creditors).  Two

categories of fraudulent transfers made avoidable under the Iowa

UFTA are those made with actual intent to hinder, delay or defraud

creditors and those made for less than reasonably equivalent value.

Iowa Code §§ 684.4, 684.5.  Plaintiff must prove each of the

elements of a fraudulent transfer by clear and convincing evidence.

Benson v. Richardson, 537 N.W.2d 748, 756 (Iowa 1995).

A threshold issue is whether the trustee has standing to pursue an avoidance action under § 544(b)(1).  The trustee must show the existence of an actual unsecured creditor holding an allowable unsecured claim who could bring the avoidance action under Iowa fraudulent transfer law.  <u>Williams v. Marlar (In re Marlar)</u>, 252 B.R. 743, 754 (B.A.P. 8th Cir. 2000), <u>aff'd</u>, 267 F.3d 749 (8th Cir. 2001); <u>Ries v. Wintz Companies, Inc. (In re Wintz Companies)</u>, 230 B.R. 848, 858-59 (B.A.P. 8th Cir. 1999).

Iowa Code § 684.5 permits avoidance of a fraudulent transfer by a creditor whose claim arose before the transfer was made.  Section 684.4 permits avoidance of a transfer that is fraudulent as to a creditor, "whether the creditor's claim arose before or after the transfer was made . . . ."  Defendants have not challenged the trustee's standing to bring claims under § 544(b)(1).  The court finds that Schaefers' amended bankruptcy Schedule F identifies several creditors whose claims arose prior to 2001, establishing plaintiff's standing to bring claims under either § 684.4 or § 684.5.  Exhibit 200A.

A transfer avoidable under § 544(b)(1) may be avoided to the extent necessary to benefit the estate.  The trustee is not limited by the amount of debt owed the creditor whose rights are being asserted.  5 Collier on Bankruptcy ¶ 544.09[5](15th ed. rev. 2005)(citing <u>Moore v. Bay</u>, 52 S.Ct. 3 (1931)).

Plaintiff claims that the January 2001 transfers of real property to G.R.D. were fraudulent because they were made for less

than reasonably equivalent value.   Iowa Code § 684.5(1) provides:

> A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor whose claim arose before the
> transfer was made or the obligation was incurred if the
> debtor made the transfer or incurred the obligation
> without receiving a reasonably equivalent value in
> exchange for the transfer or obligation and the debtor was
> insolvent at that time or the debtor became insolvent as a
> result of the transfer or obligation.

Schaefers contend that they did not became insolvent as a result of
the January 2001 transfers and that they received more than
reasonably equivalent value in exchange for the property
transferred.   Their arguments are based on the valuation of the
employment agreement with G.R.D. at $867,163.

For purposes of Iowa fraudulent transfer law, a debtor is
insolvent "if the sum of the debtor's debts is greater than all of
the debtor's assets, at a fair valuation."   Iowa Code § 684.2(1);
see also First National Bank in Fairfield v. Frescoln Farms, Ltd.,
430 N.W.2d 432, 436 (Iowa 1988) (adopting UFTA's definition prior to
its enactment by Iowa legislature).   Property to be included in the
solvency calculation is property that constitutes an "asset" under
the UFTA.   Frescoln Farms, 430 N.W.2d at 436.

An asset is "property of a debtor," but does not include
property "to the extent it is encumbered by a valid lien [or] to the
extent it is generally exempt under nonbankruptcy law."   Iowa Code §
684.1(2).   In adopting the UFTA test for insolvency, the Iowa
Supreme Court stated:

> Solvency that is based on exempt property is no better
> than insolvency to a creditor, because the property is not

29

available without affirmative action by the debtor.  If a
creditor cannot reach the property through some sort of
legal process, we hold that the property cannot be used to
show solvency....  We adopt [the UFTA] definition because
it assures that a "solvency" supported by such "assets"
will have some meaning to a creditor, as the property can
be reached through the legal process.  Under this
approach, creditors will not have to rely on a solvency
that they "cannot employ in the payment of the debts of an
unwilling debtor."

Frescoln Farms, 430 N.W.2d at 436-37 (quoting 37 C.J.S. *Fraudulent
Conveyances* § 105).

Larry and Elaine Schaefer have taken the position in their
bankruptcy case that G.R.D. is their employer and that payments made
to them by G.R.D. are exempt wages.  Exhibit 200, Schedules C, I.
They have not listed their right to payments under the employment
agreement as an item of personal property.  Exhibits 200, 200A,
Schedule B.

The company has taken the same position.  In financial
statements prepared by Larry Schaefer, G.R.D. has not treated its
obligation under the employment agreement as a long-term liability.
Exhibits H and 139.  See also Exhibits I, J, Schedule L (G.R.D. tax
return balance sheet shows current wages as only liability).

Solvency is to be determined as of the date of the transfer
alleged to be fraudulent.  Frescoln Farms, 430 N.W.2d at 437.
Approximately January 25, 2001, the date of recording the quit claim
deeds, is the relevant date for determining whether Schaefers became
insolvent as a result of the transfers.  On that date, a creditor's
ability to reach the Schaefers' interest in the contract with

G.R.D., as an employment contract, would have been severely limited. Because the parties chose to structure the transfer as an exchange of real property for guaranteed wages, the employment agreement would not be available to a creditor to the extent it was made exempt by Iowa's garnishment limitation statutes. <u>See</u> Iowa Code §§ 537.5105, 642.21 (limiting amount of debtor's paycheck creditor may garnish, limiting amount of wages creditor may garnish in calendar year); <u>In re Irish</u>, 303 B.R. 380 (Bankr. N.D. Iowa 2003) (discussing wage exemption statutes). Assuming Schaefers each received a paycheck twice a month and had income withheld at the rate of 15%, a creditor would have been able to garnish approximately $177 from each paycheck (($20,000 ÷ 24 − 15%) (25%)). Moreover, based on Schaefers' annual salary, a creditor would be limited to garnishing $800 per year from each debtor. Iowa Code § 642.21(1)(b).

For purposes of determining whether Schaefers became insolvent as a result of the transfers under Iowa Code § 684.5, the value of the employment agreement was negligible. The total value of Schaefers' other assets in January 2001 was approximately $140,000. Their total debt was at least $973,476. Plaintiff has shown by clear and convincing evidence that Schaefers were made insolvent by the transfers of real property to G.R.D. in January 2001.

The employment agreement's lack of real value to creditors also prevents Schaefers from showing that they received reasonably equivalent value in exchange for the transfer of the real property. The Iowa UFTA defines "value" as follows:

31

> Value is given for a transfer or an obligation if, in
> exchange for the transfer or obligation, property is
> transferred or an antecedent debt is secured or satisfied,
> but value does not include an unperformed promise made
> otherwise than in the ordinary course of the promisor's
> business to furnish support to the debtor or another
> person.

Iowa Code § 684.3(1).  This text is identical to § 3(a) of the

Uniform Fraudulent Transfer Act.

The Bankruptcy Appellate Panel of the Eighth Circuit recently

discussed the meaning of "value" and "reasonably equivalent value"

under the Arkansas UFTA.  <u>Williams v. Marlar (In re Marlar)</u>, 252

B.R. 743, 759-61 (B.A.P. 8th Cir. 2000), <u>aff'd</u>, 267 F.3d 749 (8th

Cir. 2001).  The court quoted Comment 2 to § 3 of the Uniform

Fraudulent Transfer Act:

> Section 3(a) is adapted from § 548(d)(2)(A) of the
> Bankruptcy Code.  See also § 3(a) of the Uniform
> Fraudulent Conveyance Act.  The definition in Section 3 is
> not exclusive.  "Value" is to be determined in light of
> the purpose of the Act to protect a debtor's estate from
> being depleted to the prejudice of the debtor's unsecured
> creditors.  Consideration having no utility from a
> creditor's viewpoint does not satisfy the statutory
> definition.  The definition does not specify all the kinds
> of consideration that do not constitute value for the
> purposes of this Act-<u>e.g.</u>, love and affection.

<u>In re Marlar</u>, 252 B.R. at 760.  In affirming the Bankruptcy

Appellate Panel's decision, the Eighth Circuit noted the distinction

between the consideration needed to create a binding contract and

the value that will be considered "reasonably equivalent" for

purposes of fraudulent transfer law.  <u>In re Marlar</u>, 267 F.3d at 755-

56.  In that case, ten dollars and "love and admiration" was held

not reasonably equivalent value as a matter of law.

32

In many cases, a debtor makes a contemporaneous transfer of property in exchange for cash or satisfaction of debt.  For example, in Textron Financial Corp. v. Kruger, 545 N.W.2d 880 (Iowa App. 1996), cited by defendants, debtor Kruger gave a quit claim deed to 62.5 acres of farmland for satisfaction of $35,000 of debt.  The property, which was subject to a life estate in Kruger's mother, was valued at between $55,000 and $117,000.  The question for the court was whether $35,000 was "reasonably equivalent" to the value of the property.  The court held that the amount of consideration, when viewed in the context of all the circumstances of the case, proved fraud by clear and convincing evidence.  Id. at 884-85.

The transfer in Schaefers' case did not involve a present exchange for cash or satisfaction of debt.  The first issue is not whether Schaefers received a reasonable equivalence in the exchange, but whether they received any value at all within the meaning of § 684.3.  An unperformed promise to provide support is the only consideration that does not constitute value as a matter of law.  Iowa Code § 684.3(1).  See generally, Note, *Rights of Creditors in Property Conveyed in Consideration of Future Support*, 45 Iowa L.Rev. 546 (1960).  Whether another form of consideration constitutes value must be determined in light of the purpose of the statute, "to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors."  In re Marlar, 252 B.R. at 760.  Thus, value must confer a direct, economic benefit upon the debtor,

33

rather than an intangible, psychological benefit. See *Dietz v. St. Edward's Catholic Church (In re Bargfrede)*, 117 F.3d 1078, 1080 (8th Cir. 1997) (discussing reasonably equivalent value under § 548(a) and consideration under Iowa common law); *see also* *INNK Land & Cattle Co. v. Kenkel*, 546 N.W.2d 585, 588-89 (Iowa 1996) (transfer by insolvent not made for "legal consideration" or "consideration deemed valuable in law" constitutes constructive fraud under common law).

Schaefers state that in exchange for the transfer of real property they received consideration in several forms: the property was taken subject to the judgment by Land O'Lakes, the debt against the property was assumed, outstanding real estate taxes were paid, and Schaefers were given an employment agreement.  Exhibit 104.  It does not seem possible that G.R.D. could have done otherwise than to take the property subject to judgments.  Moreover, if there is equity in encumbered property, the transferee of such property does not give value as to the transferor's creditors by agreeing to pay off the encumbrances.  *First National Bank of Omaha v. First Cadco Corp.*, 203 N.W.2d 770, 779 (Neb. 1973)(citing *Buell v. Waite*, 200 Iowa 1020, 205 N.W. 974 (1925)).  G.R.D.'s later payment of encumbrances, such as mortgage payments or real estate taxes, would not reduce the prejudice to unsecured creditors, because Larry and Elaine no longer held title to the property.

Schaefers' main contention is that they received value in the form of the employment agreement.  CPA Potter valued the employment

34

agreement, as of the date of the contract, at $867,163.  Of that
value, $36,409 is attributed to the self-employment taxes that
Schaefers will not have to pay because they are now earning wages.
This amount is of value only to the Schaefers; it does not
constitute value under Iowa Code § 684.3.

Another component of the employment contract is the promise to
pay health insurance, which Potter has valued at $312,466.  The
court concludes this component is an unperformed promise to provide
support, within the meaning of § 684.3, that does not constitute
value as a matter of law.  G.R.D. has provided Schaefers with health
insurance, as required by the contract.  The promise is unperformed
in the sense of being executory.  This form of consideration given
in exchange for the real property is of great value to the
Schaefers, but of no value to their unsecured creditors.  See *Rights
of Creditors in Property Conveyed in Consideration of Future
Support*, 45 Iowa L.Rev. at 550-52.

The value of the employment agreement attributed to wages to be
paid over the term of the contract is $518,288.  For the same
reasons discussed above in determining insolvency, the court finds
the promise to pay wages constitutes negligible value within the
meaning of § 684.3(1).  The agreement renders nearly all the
payments to Schaefers exempt.  The promise to pay Schaefers a
guaranteed salary for fifteen years is another form of executory
promise to furnish support.  The nature of the consideration given

35

in exchange for the transfer of real property to G.R.D. was sufficient only as between the parties. The transfer operated to the prejudice of Schaefers' unsecured creditors. In exchange for property having equity of roughly $500,000, Schaefers received an employment agreement that had virtually no utility from a creditor's viewpoint.

Moreover, the Schaefers' contention that the economic value of the employment contract was value given entirely in exchange for the transfer of the real estate ignores the value of the labor which Schaefers were required to perform under the contract. Their argument balances the entire present value of the labor contract against the value of the real estate. They place no value on the work they were required to perform over the 15-year term of the agreement. This seems to me to be a fatal flaw in their argument.

Conceivably, the salaries and benefits payable to Schaefers might exceed the value of their work for G.R.D. If so, the difference in value might be assigned to the real estate. However, there was no quantitative evidence of a disproportion between the compensation package and the work to be performed. Schaefers have not shown why the present value of the compensation package is not equivalent to the present value of their work for G.R.D. They have not shown why any quantity of their compensation should be considered as consideration only for the real estate. CPA Potter, who provided the present value calculation, appears to have calculated only present value of the future stream of income and

36

benefits.  He did not testify.  He provided no expert opinion as to why the value of Schaefers' labors ought to be ignored.

The court concludes that Schaefers made the January 2001 transfers while insolvent and received less than reasonably equivalent value in exchange.  The transfers are avoidable as constructively fraudulent as to their creditors.

The court also concludes that the January 2001 transfers are avoidable under Iowa Code § 684.4(1)(a), which provides that a transfer is fraudulent as to creditors if it was made with "actual intent to hinder, delay or defraud any creditor of the debtor."  The Iowa UFTA lists the following examples of circumstances, or "badges of fraud," that may give rise to an inference of fraudulent intent:

> In determining actual intent under subsection 1, paragraph "a", consideration may be given, among other factors, to any or all of the following:
>
> a. Whether the transfer or obligation was to an insider.
>
> b. Whether the debtor retained possession or control of the property transferred after the transfer.
>
> c. Whether the transfer or obligation was disclosed or concealed.
>
> d. Whether, before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> e. Whether the transfer was of substantially all the debtor's assets.
>
> f. Whether the debtor absconded.
>
> g. Whether the debtor removed or concealed assets.
>
> h. Whether the value of the consideration received by

37

the debtor was reasonably equivalent to the value of the
asset transferred or the amount of the obligation incurred.

     i. Whether the debtor was insolvent or became insolvent
shortly after the transfer was made or the obligation was
incurred.

     j. Whether the transfer occurred shortly before or
shortly after a substantial debt was incurred.

     k. Whether the debtor transferred the essential assets
of the business to a lienor who transferred the assets to an
insider of the debtor.

Iowa Code § 684.4(2).

Several circumstances in this case point to fraudulent intent.

Schaefers were in serious financial difficulty in January 2001.

Larry and Elaine were both judgment debtors of Land O'Lakes.  They

were delinquent on real estate taxes.  Elaine's bankruptcy case had

been dismissed in October; she was no longer protected by the

automatic stay.  Schaefers and their sons formed G.R.D.  Larry and

Elaine immediately transferred all their non-homestead real property

to the company.  The property was worth approximately $1.2 million;

Schaefers' equity was roughly $500,000.  The transfers left them

insolvent.

The court finds that G.R.D. is an insider within the meaning of

the Iowa UFTA.  Under Iowa Code § 684.1(7), an insider of an

individual debtor includes a corporation of which the debtor is a

person in control.  Schaefers chose to form G.R.D. as a limited

liability corporation.  G.R.D.'s Operating Agreement expressly gives

Larry and Elaine control of the business and financial affairs of

the company.  The Employment Agreement describes the duties of Larry

38

and Elaine only by reference to Article V of the Operating
Agreement.  Ray Schaefer said his parents do not, in actual
practice, control the business of the company.  He said he would not
allow this, since he is personally liable for G.R.D.'s debt.  The
evidence shows, however, that Ray did not personally guarantee the
company's debt until 2003.  Prior to that time, Larry and Elaine
exercised control consistent with their authority as managers of the
company.

Even disregarding the language of the Operating Agreement, the
court finds that the January 2001 transfers were made to insiders
under the non-exclusive definition in Iowa Code § 684.1(7).  The
transaction was not an arm's-length sale.  The formation of G.R.D.,
the transfer of property to the company, and the agreement to employ
Larry and Elaine constituted an arrangement between parents and
children to provide the parents with future support.  Transactions
between family members are subject to close scrutiny.  Benson v.
Richardson, 537 N.W.2d 748, 756 (Iowa 1995).

G.R.D. did not purchase the property using a conventional
promissory note and mortgage, nor did it execute a contract for
deed.  Instead, Larry and Elaine quit claimed the property to G.R.D.
which, in turn, treated the real property as the capital
contribution of sons Ray and Dean.  In a separate agreement, Ray and
Dean, presumably on behalf of G.R.D., agreed to employ Larry and
Elaine for 15 years.  The nature of the consideration, wages and
health insurance, made it of negligible value to creditors.  The

39

consideration Schaefers received was not reasonably equivalent to the value of the property transferred within the meaning of Iowa's UFTA.

Notwithstanding Schaefers' failure to prove that any portion of the stream of benefits is not truly wages, there are aspects of the arrangement which support an inference that the intent of the agreement was to defraud creditors. The qualitative terms of the employment agreement were not based on the value of Larry and Elaine's services in the marketplace. Larry and Elaine received identical salaries, without regard to whether they performed different tasks or worked different numbers of hours. Larry said that if he and his wife were unable to perform the physical work of managing the properties, they could hire someone else to do it. The agreement guaranteed Schaefers' wage income at a higher level than they had ever had before, regardless of whether G.R.D. would continue to own the properties transferred to it in 2001. The agreement guaranteed health care coverage without regard to cost. The term of the contract was based on Schaefers' desire to have regular, substantial income and guaranteed health insurance coverage until they received Social Security benefits.

Schaefers cannot have it both ways. If the value of their promise to provide labor to G.R.D. was economically equivalent to the compensation to be paid them, the compensation should not be attributed to the real estate transfer in determining whether they received reasonably equivalent value for their property (_supra_, p.

40

33).  However, if it was not economically equivalent, the transfer was structured by Schaefers to put their non-exempt property out of the reach of their creditors, and in the hands of their sons, while Schaefers were financially distressed.  The court concludes that the transfers to G.R.D. were a fraudulent arrangement between Schaefers and their sons to shield non-exempt assets from the parents' creditors by converting them to "exempt wages."

Schaefers argue that the 2001 quit claim deeds did not effect a transfer of all their property.  They still owned $90,000 of farm equipment in addition to other property that was subject to execution.  They point out that they could not have defeated the judgment liens of Land O'Lakes by transferring the property to G.R.D.  Schaefers contend that the transfers did not have the effect of hindering, delaying or defrauding their creditors, which they argue is evidence that they did not have fraudulent intent.

This argument is not persuasive.  Schaefers transferred all their non-exempt real property interests.  The equity in the real property was roughly 80% of the value of all Schaefers' property that was subject to execution.  The real property represented Schaefers' most valuable assets from the viewpoint of creditors.  One parcel, 520 Highway 18 East, was valued at approximately $160,000 and was unencumbered.  Schaefers' transfer of the real property to another entity completely defeated unsecured creditors' ability to obtain a judgment lien that would automatically attach to real property.  Obtaining a lien on Schaefers' personal property

41

would require further action.  The court need not detail the other factors that could deter creditors from executing on Schaefers' personal property, thus hindering their collection efforts.

Nor can the court say that Land O'Lakes was not prejudiced by the transfers.  In July 2001, Land O'Lakes filed a complaint in United States District Court against Larry, Elaine, Ray, and Dean Schaefer and G.R.D., alleging that the January 2001 transfers to G.R.D. were fraudulent.  Schaefers did not settle with Land O'Lakes until nearly two years later.

Schaefers argue alternatively that if plaintiff proves the existence of several badges of fraud in the challenged transactions, the court should nevertheless find that they acted in good faith on the advice of counsel.  Schaefers' attorney argues in his brief that advice of counsel can negate fraudulent intent, citing _Floret, L.L.C. v. Sendecky (In re Sendecky)_, 283 B.R. 760 (B.A.P. 8th Cir. 2002), _aff'd_, 315 F.3d 904 (8th Cir. 2003).  Docket no. 61 at 4. In _In re Sendecky_, a creditor alleged that debtor had made a false oath when preparing his bankruptcy schedules.  Debtor duplicated some claims, listed debts that were no longer collectible, and listed a debt owed his parents although they had never demanded payment.  The Bankruptcy Appellate Panel cited cases for the proposition that reliance on advice of counsel can negate or excuse fraudulent intent.  _Id._, 283 B.R. at 765.

The sense of the cases is not that a debtor will be excused from actual fraudulent intent if he has sought legal advice for the

42

execution of a fraudulent scheme.  A defense of advice of counsel may overcome an inference of fraud or willful misconduct, but the defendant must show a full disclosure of all relevant facts to the attorney and a reasonable belief that he was receiving reliable advice.  See Matter of Mascolo, 505 F.2d 274, 276-77 & n.4 (1st Cir. 1974).  In In re Sendecky, the bankruptcy court found that the debtor misunderstood his attorney's advice.  The court ruled against the creditor, and the Bankruptcy Appellate Panel affirmed.

Schaefers' case more closely resembles the facts in Cuervo v. Hull (In re Snell), 240 B.R. 728 (Bankr. S.D. Ohio 1999).  Snell admitted transferring several items of property to put them out of reach of a judgment creditor.  He argued, however, that his actual intent to hinder and delay a creditor was excused, because his attorneys had advised him to make the transfers and prepared the documents necessary to do so.  The court rejected the argument, stating that a debtor's reliance must be in good faith, and that a finding that the debtor knew the purpose of a transfer was to hinder or delay a creditor is inconsistent with good faith.  In re Snell, 240 B.R. at 730-31.

Attorney Putnam did not testify as to what information Schaefers gave him or what advice he gave them.  Schaefers wanted to protect the equity in their real property from creditors.  Their sons participated in the arrangement in order to give financial assistance to their parents.  The court finds there was clear and convincing evidence that Schaefers knew that the transaction was

43

structured as a transfer of real estate for an employment agreement in order to convert non-exempt equity in the property into exempt wages.

IT IS ORDERED that the trustee's objection to debtors' claims of exemption in their homestead is overruled.

IT IS FURTHER ORDERED that plaintiff's objection to debtors' discharges under 11 U.S.C. § 727(a) is dismissed.

IT IS FURTHER ORDERED that plaintiff's claims to avoid the April 2003 mortgage on debtors' homestead under 11 U.S.C. §§ 547(b) and 548(a) are dismissed.

IT IS FURTHER ORDERED that debtors' transfers of real property to G.R.D. Investments, L.L.C. by quit claim deeds dated on or about January 16 and 17, 2001, are avoidable under 11 U.S.C. § 544(b)(1).

DATED AND ENTERED:

September 21, 2005

William L. Edmonds, Bankruptcy Judge

44